# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

_____

No. ACM 40013

_____

**UNITED STATES**
*Appellee*

v.

**Caleb A.C. SMITH**
Airman (E-2), U.S. Air Force, *Appellant*

_____

Appeal from the United States Air Force Trial Judiciary

Decided 25 May 2022

_____

*Military Judge:* Bryan D. Watson.

*Sentence:* Sentence adjudged on 4 September 2020 by GCM convened at Shaw Air Force Base, South Carolina. Sentence entered by military judge on 13 October 2020: Dishonorable discharge, confinement for 60 days, total forfeitures, and reduction to E-1.

*For Appellant:* Major Megan E. Hoffman, USAF; Brian Pristera, Esquire.

*For Appellee:* Lieutenant Colonel Matthew J. Neil, USAF; Major Morgan R. Christie, USAF; Mary Ellen Payne, Esquire.

Before POSCH, RAMÍREZ, and CADOTTE, *Appellate Military Judges*.

Judge RAMÍREZ delivered the opinion of the court, in which Senior Judge POSCH and Judge CADOTTE joined.

_____

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

_____

RAMÍREZ, Judge:

Contrary to his pleas, a general court-martial composed of officer members convicted Appellant of one charge and one specification of sexual assault, in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920.[1] He was acquitted of a second specification that alleged sexual assault by digital penetration, in violation of Article 120, UCMJ. The members sentenced Appellant to a dishonorable discharge, confinement for 60 days, reduction to the grade of E-1, forfeiture of all pay and allowances,[2] and a reprimand. The convening authority disapproved the adjudged reprimand, denied Appellant's requests for deferment and waiver of automatic forfeitures, but took no other action on the findings or sentence.[3]

Appellant raises three issues on appeal, which we have reordered and reworded: (1) whether the evidence was legally and factually sufficient to support his conviction, (2) whether the military judge erred in admitting text messages and testimony as excited utterances, and (3) whether Appellant's right to timely post-trial processing was violated. We find no material prejudice to a substantial right of Appellant and affirm the findings and sentence.

## I. BACKGROUND

HS, the victim in this case, joined the Air Force as a cryptologic language analyst at the age of 18 in 2014. After basic training, she went to her technical school at the Defense Language Institute in Monterrey, California, until March

---

[1] All references in this opinion to the punitive articles of the Uniform Code of Military Justice (UCMJ) are to the *Manual for Courts-Martial, United States* (2016 ed.). Unless otherwise noted, all other references to the UCMJ and Rules for Courts-Martial (R.C.M.) are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] The Statement of Trial Results and entry of judgment describe this part of the sentence as "Forfeitures of Pay and/or Allowances: Total." Appellant claims no prejudice from this irregularity and we find none.

[3] Because Appellant was convicted of a specification involving an offense committed before 1 January 2019, the convening authority was required to approve, disapprove, commute, or suspend the sentence of the court-martial in whole or in part. *United States v. Brubaker-Escobar*, 81 M.J. 471, 472 (C.A.A.F. 2021) (per curiam). However, the convening authority did not take one of these four actions on each component of the adjudged sentence. Therefore, the convening authority made a procedural error when he failed to act on the sentence. *Id.* at 474–75. In line with Article 59(a), UCMJ, 10 U.S.C. § 859(a), "procedural errors are 'test[ed] for material prejudice to a substantial right to determine whether relief is warranted.'" *Id.* at 475 (alteration in original) (quoting *United States v. Alexander*, 61 M.J. 266, 269 (C.A.A.F. 2005)). Appellant does not raise this as an issue. Nonetheless, having reviewed the convening authority's procedural error for material prejudice to a substantial right, we find no prejudice.

2016, and then completed additional training at Goodfellow Air Force Base (AFB), Texas, until July 2016. This was followed by her first assignment at Fort Gordon, Georgia, where she met Appellant. They were both assigned to bay orderly duties at Fort Gordon during the summer of 2018. HS and Appellant would hang out after work with the other bay orderly Airmen. The group would get together once or twice per week to play "Dungeons & Dragons." Although they did not have a romantic relationship, HS and Appellant would get lunch three to five times a week while at work. HS was dating a Marine, DS, stationed at Camp Lejeune, North Carolina. The lunches between HS and Appellant continued until November 2018.

On 16 November 2018, Appellant and HS went to a concert together. HS had invited three military members, but only Appellant accepted the invitation. HS's boyfriend did not go to the concert because he was unavailable that weekend. After the duty day was over, HS and Appellant drove from Fort Gordon, Georgia, to Charlotte, North Carolina, the site of the concert venue.

The drive from Fort Gordon to Charlotte was approximately two-and-a-half hours; HS drove. HS and Appellant originally planned to arrive in Charlotte before 1800, check into a hotel, then go to the concert venue. They planned to stay the night, and to save money, they made the decision to get one hotel room with two beds. Contrary to their plan, they left late from Fort Gordon and arrived in Charlotte at approximately 1830. They did not check into the hotel and went straight to the concert venue instead.

HS parked her car at the concert venue. After entering the venue, the two purchased mixed drinks containing alcohol, then went to the stage to watch the opening bands. After they ordered the first round, HS and Appellant took turns standing in line to get drinks because the line for the bar was long. According to HS, the mixed drinks were "very strong." She did not eat at the concert or while drinking the mixed drinks.

After the first opening band performed, HS and Appellant went to that band's "meet and greet" and merchandise area. HS believed this was at approximately 2100. It was at this point when things started getting "hazy" for HS. She explained that she did not "remember exactly what [they] talked about," and did not remember "what merch[andise] was there or whether [she] bought anything or anything along those lines." She felt "drunk and dizzy" and later recalled that she lost memory of what occurred next.

HS testified that she did not remember anything from her time at the merchandise table until she was at the hotel room that night. All she remembered of the hotel room was getting into bed. As there were two beds, HS recalled choosing the one closest to the air conditioning and remembered going to sleep fully dressed.

HS's next memory was waking up the next morning in the other bed with Appellant. She was fully undressed and Appellant had his arm draped around her. She testified she had no memory of how her skinny jeans and other clothes were removed. HS said that she "froze. [She] was freaking out. [She] just kind of panicked." She then "got up and went to the bathroom very quickly." She felt "[n]auseated, panicky . . . [and] was shaking." She also noticed that her vaginal area was sore and bleeding, but "just shrugged [this feeling] off." As she got dressed, she noticed that her underwear was missing. She eventually found them shoved underneath the covers of the opposite bed from the one in which she woke up. When she found them, her underwear "were completely ripped through on one side, at the hip."

HS's car was not at the hotel, so she ordered an Uber car service to take her back to the concert venue to look for it. However, when she arrived, she could not find her car. She called Appellant and he told her that the previous night, a security guard stopped Appellant from driving away from the venue. The security guard told Appellant that because he had been drinking, he needed to call a cab or an Uber. Appellant explained to HS that he had then moved the car and parked it out of the way, but he could not recall where he parked it. HS walked around the concert venue and eventually found her car parked across the street.

After retrieving her car, HS went back to the hotel, changed her clothing, and checked out of the hotel with Appellant. From the hotel, HS and Appellant went to breakfast and coffee. At this point HS asked Appellant why her underwear was torn, and he told her that he did not know.

After getting breakfast, HS and Appellant went to a gas station where she used the bathroom. While washing her hands, she noticed a hickey or bruise on her neck and another by her collarbone. HS pulled her shirt down and saw bruises all over her chest and on the tops of her arms. In her words, she "freaked out," panicked, felt nauseated, and started shaking. At this point, and while still feeling nauseated, shaky, and sweating, she sent a Snapchat message to one of her friends, MH, telling MH that she thought Appellant had raped her.

According to HS, it was at this point that she realized she may have been a victim of sexual assault. HS realized that she should not have "brushed everything off at the hotel room." HS testified that "initially [she] thought that it was impossible, but [she] just felt like it was obvious proof and [she] couldn't really deny it anymore at that point." HS explained that she thought it would have been impossible because she and Appellant were friends.

After leaving the gas station, HS had no plan for how to deal with the situation. She testified that she just wanted to get back to Fort Gordon. The drive back was awkward, but she felt compelled to ask Appellant why she woke up

in bed with him. Appellant told HS she had urinated in the other bed and went to sleep in the same bed as Appellant. They also talked about how HS was acting at the concert. According to HS's testimony, Appellant told HS that she sat down on the floor of the concert venue, and the security guards told Appellant to take HS outside. Appellant complied and helped HS outside and put her on the sidewalk. Appellant explained that the driver who took them to the hotel helped carry HS into the hotel. According to HS, on the drive back to Fort Gordon, Appellant was a "little bit reserved, standoffish, [and] quiet."

When they returned to Fort Gordon, HS dropped Appellant at the barracks where he lived. Owing to her concern that she may have been sexually assaulted, she sought advice from a friend, then went to the emergency room at Fort Gordon for a medical examination. While at the hospital, she made a restricted report with the Sexual Assault Response Coordinator; she later made it unrestricted. During a Sexual Assault Forensic Examination (SAFE), a nurse collected vaginal, cervical, pubic mound, perineal, and anal swabs for DNA testing. In time, agents of the Air Force Office of Special Investigations (AFOSI) sent the swabs, as well as her underwear from the night in question, for forensic analysis. The day after the SAFE, HS sent a text to Appellant asking where her favorite sweater was. As HS testified: "I had left my favorite sweater at the concert, and [Appellant] had told me that he tried to get me to grab it, but I guess I was too out of it or something."

In March and April 2019, AFOSI agents conducted two interviews with Appellant. Both interviews were video-recorded and significant portions were admitted into evidence at trial. During the first interview, Appellant agreed to provide a sample of DNA for comparison with evidence collected from HS during the SAFE. Initially, Appellant took the position that he could not recall most of what happened with HS and denied having any sexual contact with HS. Upon further questioning, Appellant acknowledged having sexual contact with HS and that he had lied to the AFOSI agents at the beginning. After the first video interview, Appellant provided a written statement where he apologized about not initially being truthful. The written statement was admitted into evidence at Appellant's trial. The following describes Appellant's statements in greater detail.

Collectively, Appellant explained that he and HS left work and she drove them both to the concert venue. HS "got drunk there," and then they "got kicked out because [HS] couldn't stand up." They "had to call a taxi because [Appellant] was drinking too." According to Appellant, they never saw the band they hoped to see play because they were kicked out of the venue.

With regard to drinking, Appellant stated that he had "[f]our or five double shots" of liquor and that he did not know what HS had, but that at one point, she was "literally falling over." Appellant said that he took HS to the back seats

of the venue, and that they were told to leave at that point because HS could not stand up anymore. Appellant also said that HS's speech was slurred, and it was on that night that she was the most intoxicated he had ever seen. According to Appellant, the concert security guards said words to the effect of "She's too drunk," and "You guys need to leave."

Appellant told the AFOSI agents that he and HS then "went back to the hotel. There was a lot of stuff that happened there." Appellant stated that HS "peed herself twice," but he could not remember everything because it was a "blur." He then immediately said, "I didn't do anything."

When asked about how they got to the hotel, Appellant explained that they "were drunk trying to find the hotel address." Appellant clarified that HS was too drunk to order a taxi and that he had to unlock her phone to figure out the hotel address. Appellant also told the AFOSI agents that he and HS "were pretty much stumbling to the door" of their room, and that the taxi driver had to help them to their hotel room. According to Appellant, the taxi driver unlocked the door for Appellant because he could not get the key into the lock.

Appellant told AFOSI agents that once inside the hotel room, HS sat on the corner of his bed and "peed herself when she sat on the bed." She then "stripped down," got on the bed she had claimed for herself and urinated on that bed too. Appellant explained that HS was no longer talking, but only mumbling.

Up until this point in the first interview, Appellant had been insistent that he did not recall anything else, and that HS "peeing" on her bed was his last memory. However, after some additional back and forth with the agents, Appellant told AFOSI:

> We didn't have sex, but we made out. I ate her out, and then I decided -- when she was rubbing up on me, I decided that it was a wrong idea to have sex with her since she was drunk, and I was scared that I would get in trouble for it.

Appellant then apologized to the agents because he was lying during the interview when he said that he did not remember what had happened. Appellant told the agents:

> I was lying to you at the time. I just didn't --
>
> . . . .
>
> I should have told her the truth too, so -- I was just scared because she was drunk and everything.

Appellant then provided more details. He said that HS removed her own clothes, but that he had trouble getting HS's bra off, which she helped him

6

remove. Additionally, contrary to his claim that he did not know how HS's underwear had been torn, he confessed that he "ripped off her underwear." He continued, explaining:

> I got up. That's when she peed the bed.
>
> . . . .
>
> I got her cleaned up. We just continued still. We were just rolling around, making out. I ate her out. At the time we fell off the bed, and then that's when we moved to my bed.
>
> . . . .
>
> And then it was -- she was on top of me and grinding on me and everything but -- and I got her off because it was one of my more sober moments.
>
> . . . .
>
> And, you know, I said that it wouldn't be smart, and I just got her to go to bed.
>
> . . . .
>
> I never had sex with her. I made sure I stopped before it got too far, but going that far was already too much.

Appellant then confirmed that when he said that he "ate her out," it meant that he put his mouth on HS's vagina. When asked in the second interview about why he stopped, Appellant explained, "We were too drunk, and she has a boyfriend, and I was -- I just didn't want to continue after thinking that."

Throughout Appellant's first interview, he claimed he could not recall whether he penetrated HS's vagina with his finger. However, in the follow-up interview, while recapping the previous interview, an AFOSI agent told Appellant: "That's right. That's right. Yeah, I remember you saying last time it was just digital and oral sex." Appellant responded with "[y]eah." However, there was no follow-up to that answer.

As described earlier, after the first interview, Appellant prepared a written statement in which he apologized for not initially being truthful with the AFOSI agents during the interview. He explained that he was scared and thought he was going to get in trouble because there was sexual contact between him and HS. He nonetheless acknowledged that they were "both drunk so it was still wrong."

Ms. MC, a forensic biologist, also testified. She stated her primary duties are to examine physical evidence for the presence of biological fluids and perform DNA analysis on them. The military judge recognized Ms. MC as an ex-

pert in the fields of serology and DNA analysis. Ms. MC testified that Appellant's DNA was identified on swabs taken of HS's pubic mound area as well as the inside crotch area of HS's underwear. Ms. MC explained that the DNA profile from a swab of HS's pubic mound was at least 1 quintillion times more likely to have originated from Appellant and HS than if it originated from HS and an unknown individual. In response to a question by trial counsel, Ms. MC acknowledged that in her expert opinion, the DNA collection and results of her analysis were "consistent with [Appellant] performing oral sex on [HS]."

## II. DISCUSSION

### A. Legal and Factual Sufficiency

Appellant argues that the Government failed to prove, beyond a reasonable doubt, that HS was incapable of consenting. He further argues that the Government failed to prove that Appellant's mistake of fact as to consent was unreasonable. Appellant specifically claims that based on her conduct, HS had the "ability to consent," and thus, this court cannot be convinced beyond a reasonable doubt that she was incapable of consenting. Additionally, Appellant claims that the facts supported a conclusion that HS consented to the sexual activity or that Appellant had a reasonable mistake of fact regarding her consent. Thus, Appellant contends that this court cannot be convinced that a reasonable factfinder could have found that HS did not actually consent or that the Government had proven beyond a reasonable doubt that Appellant's mistake of fact was unreasonable. As discussed below, we disagree with these contentions.

#### 1. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citation omitted). As we resolve "questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325. We take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of

guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399.

In order to find Appellant guilty of sexual assault in violation of Article 120(b)(3)(A), UCMJ, the court members were required to find the following elements beyond a reasonable doubt: (1) That at or near Charlotte, North Carolina, on or about 16 November 2018, Appellant committed a sexual act upon HS, by causing penetration, however slight, of HS's vulva by Appellant's tongue; (2) that Appellant did so when HS was incapable of consenting to the sexual act due to impairment by alcohol; (3) that Appellant knew or reasonably should have known HS was incapable of consenting to the sexual act due to impairment by alcohol; and (4) that Appellant did so with an intent to gratify his sexual desire. *See Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*), pt. IV, ¶45.b.(4)(f).

With regard to consent, the statute explains that "[t]he term 'consent' means a freely given agreement to the conduct at issue by a competent person." 2016 *MCM*, pt. IV, ¶ 45.a.(g)(8)(A). The statute further explains an "incompetent person cannot consent." 2016 *MCM*, pt. IV, ¶ 45.a.(g)(8)(B). A person is incapable of consenting if she lacks the cognitive ability to appreciate the sexual conduct in question or lacks the physical or mental ability to make or to communicate a decision about whether she agrees to the conduct. *See United States v. Pease*, 75 M.J. 180, 185–86 (C.A.A.F. 2016) (citation omitted).

### 2. Analysis

Appellant attacks his conviction in three ways. First, he argues that the evidence establishes that HS consented. Second, in Appellant's view, the evidence did not establish that HS was too drunk to render her incapable of consenting. Third, Appellant claims that he should have been acquitted based on his mistake of fact as to her consent. We address these contentions in turn.

Appellant claims consent is shown from his statements to AFOSI agents about mutual kissing and rubbing against each other, and that HS had removed her own clothes. However, HS testified she had no memory of how her clothes came off that night, much less anything else that happened. The evidence on which Appellant relies for consent is Appellant's own statements to AFOSI. In that regard, the trier of fact readily could discount Appellant's version of events as self-serving and untruthful, especially in light of evidence that Appellant admitted to AFOSI agents that he was untruthful about other aspects of what happened.

HS's testimony that she had no recollection shortly after getting to the hotel is persuasive evidence that she was so intoxicated she was incapable of consenting. The evidence was clear that HS could not recall anything shortly after

the first opening band performed, that she only recalled getting to the hotel room and picking a bed, and that she did not recall anything again until the next morning—when she woke up naked and with Appellant's arm strewn across her chest.

Additionally, Appellant's statements to AFOSI provide ample evidence to satisfy the legal standard that HS was incapable of consenting to the sexual act due to impairment by alcohol. Evidence showed that Appellant knew HS was drunk at the concert venue. Although HS remembered that she had three mixed drinks, Appellant told AFOSI agents that he had four or five double shots of liquor and that he and HS were taking turns buying drinks. Appellant knew that HS was so drunk that she could not stand up while at the concert, and at one point she was "literally falling." Appellant explained that, as a result, HS was kicked out of the concert before the main band even started. He also said that HS's speech was slurred, and that this was the most intoxicated he had ever seen her. Appellant knew that HS left her favorite sweater at the concert and that she was "too out of it" to understand that she needed to get it. HS was even visibly drunk to third parties at the concert. The concert security told Appellant that HS was "too drunk" to stay at the concert and that he and HS needed to leave.

Appellant knew that HS was too drunk to order a taxi and that he had to unlock her phone to figure out the hotel address. Appellant knew that HS was so drunk that she could not walk into the hotel room by herself, to the point that the taxi driver had to help Appellant take HS to the room. Once in the hotel room, Appellant knew that HS was so drunk that "she peed herself twice." Appellant also knew that HS was no longer talking, but only mumbling at that point. Appellant knew all these things before he made the decision to perform oral sex on her by penetrating HS's vulva with his tongue.

Appellant argues that the evidence does not support a finding of guilty because the Government failed to prove beyond a reasonable doubt that Appellant's "defense of mistake of fact as to consent was not reasonable." We find that mistake of fact as to consent was not "in issue," R.C.M. 920(e)(3), here because the third element required the Government to prove beyond a reasonable doubt that Appellant reasonably should have known of HS's impairment. *See United States v. Teague*, 75 M.J. 636, 638 (A. Ct. Crim. App. 2016) ("[I]f the [G]overnment proves that an accused should have reasonably known that a victim was incapable of consenting, the [G]overnment has also proven any belief of the accused that the victim consented was unreasonable."); *see also United States v. Rich*, 79 M.J. 572, 587 (A.F. Ct. Crim. App. 2019) (en banc) (citing *Teague*, 75 M.J. at 638) ("[B]y proving the elements of the charged offense, the Government necessarily disproved the existence of either asserted mistake of fact."), *aff'd*, 79 M.J. 472 (C.A.A.F. 2020). The affirmative defense of mistake of fact as to consent under R.C.M. 916(j)(1) was not a defense to the

charged conduct. Accordingly, we decline to consider it as part of our legal sufficiency review.

Nonetheless, we do consider whether the Government proved beyond a reasonable doubt the third element of the charged offense, whether Appellant knew or reasonably should have known HS was incapable of consenting to the sexual act due to impairment by alcohol. We find that it did. Appellant's statements to AFOSI show this element was proven. In Appellant's telling, "I decided that it was a wrong idea to have sex with her since she was drunk, and I was scared that I would get in trouble for it." Appellant also said this another way: "I never had sex with her. I made sure I stopped before it got too far, *but going that far was already too much.*" (Emphasis added). He also explained that when he got HS off of him, it was "one of [his] more sober moments."[4] A rational trier of fact could conclude from Appellant's admission that because he knew HS was too drunk to consent to vaginal sex, he reasonably should have known that she was incapable of consenting to oral sex. Therefore, the evidence supports the finding that the Government proved this third element beyond a reasonable doubt.

Drawing every reasonable inference from the evidence of record in favor of the Government, we conclude the evidence was legally sufficient to support Appellant's conviction beyond a reasonable doubt. Additionally, having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt and find his conviction factually sufficient.

## B. Excited Utterance in Testimony and Exhibit

Without objection, HS testified that she sent a Snapchat[5] message to one of her friends, MH, stating that she thought that Appellant had raped her. However, over the Defense's objection, the Government introduced an exhibit showing this message and other messages between HS and MH. Appellant alleges that the military judge erred in admitting both HS's testimony and the messages into evidence as excited utterances. Appellant argues this was improper because too much time had elapsed, and because HS "had no memory

---

[4] To the extent that the evidence demonstrated Appellant had been drinking alcohol, we note that "[v]oluntary intoxication is not a defense to a general-intent crime, but it may raise a reasonable doubt about actual knowledge, specific intent, willfulness, or premeditation when they are elements of a charged offense." *United States v. Hensler*, 44 M.J. 184, 187 (C.A.A.F. 1996) (citations omitted).

[5] Appellant's brief refers to text messages; however, to be consistent with the testimony and evidence, we will refer to the messages as "Snapchat messages" because that application was used to exchange the messages.

of the events in [ ] question" so her "statement that she believed she was raped was necessarily the product of reflection and deliberation . . . ."

As discussed below, we find the military judge did not abuse his discretion in admitting the testimony or the exhibit.

**1. Additional Background**

On direct examination HS testified as follows, without objection:

> [Trial Counsel (TC)]: What happens when you're at the gas station?
>
> [HS]: I went inside to the bathroom and used it. And then when I went to wash my hands, I noticed there was a hickey or bruise of some sort on my neck and one on my collarbone. And I pulled down my shirt a little bit to look, and there were bruises all over my chest and on the tops of my arms, on the biceps, and I sort of freaked out.
>
> [TC]: You say you "freaked out." What do you mean?
>
> [HS]: I panicked. I didn't cry, but I felt nauseated and started shaking again. And I messaged my friend [MH], and I told him that I thought that [Appellant] had raped me.

Trial counsel then asked additional questions unrelated to the Snapchat messages before providing HS with a four-page exhibit containing screenshots of the Snapchat messages between HS and MH. When trial counsel began asking questions about the content of the exhibit, trial defense counsel then objected as to relevance and to HS "reading from the exhibit that has not been admitted." Trial defense counsel also objected that the exhibit was cumulative based on HS's testimony that had already been given, that the panel members were going to have photographs of the alleged injuries, and that the document contained hearsay from MH.

The military judge held an Article 39(a), UCMJ, 10 U.S.C. § 839(a), hearing outside the presence of the panel members. Although this is not supported by the record, trial defense counsel stated, "I also objected to hearsay in terms of her statement, so they're basically offering this as an excited utterance here." Trial defense counsel also stated, "[T]hey failed the foundational elements of excited utterance as a threshold matter . . . because she is calling him -- I mean, she is texting him. She's not still looking at a startling event or condition." Then, and still in a hearing outside the panel members' presence, the military judge allowed trial counsel and trial defense counsel to develop further testimony from HS regarding the purported excited utterances.

HS explained that the Snapchat messages at issue occurred while she was in the bathroom at the gas station. She explained that at the time she sent the

messages, she was experiencing sweating, shakiness, and nausea brought on by seeing the bruising on her body and making the connection to what occurred at the hotel.

The military judge first ruled:

> [I]n regards to the objections that have been lodged by the [D]efense, I have taken a look at [Military Rule of Evidence] 403, and I do not believe this meets the standard of inadmissibility based on cumulativeness. That objection is overruled.

> I'm also ruling on the basis of a [Mil. R. Evid.] 403 objection simply because if it conflicts with injuries in the SANE report, that's not enough to cause it to be inadmissible under [Mil. R. Evid.] 403 as far as being unfairly prejudicial. Specifically, in the language of the rule, I do not believe that its probative value is substantially outweighed by the danger of unfair prejudice.

> Drawing ultimate conclusions, I'm overruling that objection as well.

Regarding the messages by HS and the responses of MH in the Snapchat messages that are at issue in this appeal, the military judge ruled that the Government had laid sufficient foundation for excited utterance as to HS's messages. The military judge ruled, moreover, that he was allowing MH's responses to the excited utterances "as effect on the hearer given the fact that this witness is responding to each one of those [messages] whenever she does issue one of her excited utterances."

The messages between HS and MH were admitted as Prosecution Exhibit 2. Part of their exchange included the following:

> [HS] I think he raped me

> [MH] Wait what

> [MH] What happened?

> [MH] Are you okay?

> [HS] No

> [HS] I noticed a hickey on my neck and then saw handprints on my boobs

**2. Law**

"A military judge's decision to admit or exclude evidence is reviewed for an abuse of discretion." *United States v. Bowen*, 76 M.J. 83, 87 (C.A.A.F. 2017) (internal quotation marks and citation omitted). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion."

*United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000). "The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *Id.* (internal quotation marks and citations omitted). We "will reverse for an abuse of discretion if the military judge's findings of fact are clearly erroneous or if his decision is influenced by an erroneous view of the law." *United States v. Feltham*, 58 M.J. 470, 474 (C.A.A.F. 2003) (internal quotation marks and citation omitted).

"Where an appellant has not preserved an objection to evidence by making a timely objection, that error will be forfeited in the absence of plain error." *United States v. Knapp*, 73 M.J. 33, 36 (C.A.A.F. 2014) (internal quotation marks and citations omitted). Under the plain error standard, the appellant bears the "burden of establishing (1) error that is (2) clear or obvious and (3) results in material prejudice to his substantial rights." *Id.* (citation omitted).

An "excited utterance" is a "statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." Mil. R. Evid. 803(2). Excited utterances are "not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness." Mil. R. Evid. 803. The test to determine whether a hearsay statement qualifies as an excited utterance involves three prongs:

> (1) the statement must be spontaneous, excited or impulsive rather than the product of reflection and deliberation; (2) the event prompting the utterance must be startling; and (3) the declarant must be under the stress of excitement caused by the event.

*Bowen*, 76 M.J. at 88 (internal quotation marks and citations omitted). "Relevant to the third prong of this inquiry is the physical and mental condition of the declarant." *Id.* (internal quotation marks and citation omitted). "A lapse of time between a startling event and an utterance, while a factor in determining whether the declarant was under the stress of excitement caused by the event, is not dispositive of that issue." *United States v. Donaldson*, 58 M.J. 477, 483 (C.A.A.F. 2003) (citations omitted).

**3. Analysis**

We will first address the Snapchat exhibit and then address the testimony that preceded the exhibit being admitted. We find the record contains sufficient facts to support the military judge's conclusion that HS's messages were admissible as excited utterances, and do not find that the military judge's ruling was arbitrary, fanciful, clearly unreasonable, or clearly erroneous. In order to find an abuse of discretion, the standard requires more than "a mere difference of opinion." *McElhaney*, 54 M.J. at 130. Even if we would not have made the same decision as the military judge, any difference of opinion does not equate to an abuse of discretion.

The testimony before the military judge was that HS did not type out the Snapchat messages until she was in the restroom, when she first noticed bruising on her body. This made her think about what happened the evening prior, as it related to her morning observations of torn underwear and blood in her vaginal area. Putting these things together caused HS to start shaking, to start sweating, and to become nauseated. It was while she was feeling those things, and experiencing those physical manifestations, that she contemporaneously sent a message to her friend that she thought she was raped.

We are not persuaded by Appellant's position that in order for the excited utterance to be available to the proponent, the witness must have a memory of the events in question. The record supports the conclusion that HS's statement, "I think he raped me," was not a statement of fact, but instead a spontaneous belief or opinion, under physical and emotional stress of shaking, sweating, and feeling nausea. Additionally, we are not convinced that too much time had elapsed from the previous night that would preclude the military judge from concluding the message was an excited utterance. While passage of time is one factor in determining whether a declarant was under the stress of excitement caused by an event, it is not dispositive. Based on the record, we find the military judge could conclude that the cause of HS's stress was not thinking about the previous night in a pensive manner, or that the statements were made after reflection and deliberation. Instead, the evidence shows that seeing hickeys and bruises—and having no explanation for them—as well as putting all the pieces together in her mind—the torn underwear and blood coupled with bruising—sent HS into distress, and she was under that stress when she sent the messages.

We find the record supports the conclusion that the discovery of the hickey and bruising startled HS, as she had not seen them up until that very moment. We further find that the military judge could have concluded that HS was still under the stress of excitement caused by discovering the bruising as shown by her shaking, sweating, and feeling nauseated while she sent the messages. Therefore, we conclude that the military judge did not abuse his discretion in finding that the statements at issue were excited utterances.[6]

Because we find the military judge's ruling admitting the written statements in the Snapchat messages as excited utterances was not an abuse of discretion, we similarly find that Appellant has failed his burden under the plain error standard with regard to the military judge's ruling in permitting

---

[6] Although Appellant does not challenge the admission of MH's questions on appeal, we find the military judge did not err in ruling those questions were offered for their effect on the listener and not for the truth of the matter asserted.

HS's unobjected-to testimony regarding those statements. Therefore, Appellant is not entitled to any relief on this issue.

## C. Delay in Post-Trial Processing

152 days elapsed between the announcement of the sentence in Appellant's case and the docketing of the case with this court. Appellant argues that the post-trial delay between the convening authority's decision on action and the docketing of Appellant's case before this court is facially unreasonable and merits sentence relief.[7] The Government acknowledges that there is a threshold showing of facially unreasonable delay in docketing Appellant's case with this court, but argues no relief is warranted.

### 1. Additional Background

Appellant was sentenced on 4 September 2020; the convening authority's decision on action is dated 23 September 2020; the sentence and judgment were entered on 13 October 2020; and Appellant's case was docketed with this court on 3 February 2021.

In response to Appellant's post-trial processing claim, the Government moved to attach a declaration from the Law Office Superintendent at the 20th Fighter Wing Office of the Staff Judge Advocate (20 FW/JA), located at Shaw AFB, South Carolina, concerning the issue before us. We granted the motion and find it appropriate to consider the declaration.[8] The information below is derived from that declaration.

Appellant's court-martial concluded on Friday, 4 September 2020. On Monday, 7 September 2020, the assigned court reporter began transcribing the record. The 20 FW/JA office began assembling the record of trial in October 2020. The court reporter emailed the completed transcript to the case paralegal on 3 December 2020. Once the 20 FW/JA office received the completed trial transcript, the personnel assigned to Appellant's case finished its assembly and provided copies to all necessary parties. On 29 December 2020, 20 FW/JA completed compiling the record of trial and its attachments. That same day, 20 FW/JA mailed two copies of the record to the Department of the Air Force,

---

[7] Appellant claims that there was a 169-day delay from the convening authority's decision on action to the docketing of Appellant's case with the court; however, this appears to be a miscalculation.

[8] We find it proper to consider the declaration for determination of the issue before us, given that the post-trial delay is raised by materials in the record. *See United States v. Jessie*, 79 M.J. 437, 440 (C.A.A.F. 2020) (observing that precedents have permitted Courts of Criminal Appeals to supplement the record when doing so is necessary for resolving "issues that are raised by materials in the record but that are not fully resolvable by those materials").

Military Justice Division (DAF/JAJM). On 21 January 2021, 20 FW/JA was notified by DAF/JAJM that the original copy of the record of trial had yet to be received. The 20 FW/JA office located the original and mailed it to DAF/JAJM on the following day, 22 January 2021. The case was ultimately docketed with this court on 3 February 2021—152 days after the announcement of the sentence.

### 2. Law

This court reviews de novo whether an appellant's due process rights are violated because of post-trial delay. *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (citations omitted).

*Moreno* outlined thresholds for facially unreasonable delay during three portions of the post-trial and appellate process. *Id*. at 141–43. *Moreno* established a presumption of facially unreasonable delay where: (1) the convening authority did not take action within 120 days of the completion of trial, (2) the record was not docketed with the Court of Criminal Appeals within 30 days of the convening authority's action, or (3) the Court of Criminal Appeals did not render a decision within 18 months of docketing. *Id*. at 142.

If there is facially unreasonable post-trial delay, we apply a four-factor test to determine what relief, if any, an appellant should receive: (1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of his right to a timely review; and (4) prejudice to the appellant. *Id*. (citations omitted).

In *United States v. Livak*, this court explained that "[d]epending on the length and complexity of the record involved, we can envision cases in which the court reporter is still transcribing the proceedings after the convening authority's decision." 80 M.J. 631, 633 (A.F. Ct. Crim. App. 2020). "As such, the prior 30-day period from action to docketing, which primarily involved transmitting an already-completed [record of trial] to the Court of Criminal Appeals, now overlays substantive actions such as completing the preparation of the record." *Id*. Therefore, "the specific requirement in *Moreno* which called for docketing to occur within 30 days of action no longer helps us determine an unreasonable delay under the new procedural rules." *Id*.

This court ultimately decided that, consistent with the United States Court of Appeals for the Armed Forces threshold standards for facially unreasonable delay established by *Moreno*, we can apply the aggregate *Moreno* standard of 150 days from the day an appellant was sentenced to docketing with this court, to determine whether an appellant's case has been subject to a facially unreasonable delay. *Id*. *Livak* concluded that the "150-day threshold appropriately protects an appellant's due process right to timely post-trial and appellate review and is consistent with our superior court's holding in *Moreno*." *Id*.

Even in the absence of a due process violation, this court still considers whether relief for excessive post-trial delay is warranted consistent with this court's authority under Article 66(d), UCMJ, 10 U.S.C. § 866(d). *See United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002); *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016).

**3. Analysis**

We find that 152 days elapsed between announcement of Appellant's sentence and the docketing of the case with this court. This length of time exceeded the 150-day *Livak* threshold by two days; thus, we find that there was a facially unreasonable delay in post-trial processing. Therefore, we apply the appropriate factors.

First, we find the length of the delay—two days beyond the 150-day *Livak* threshold—to be minimal. Second, regarding the reasons for the delay, it is unclear from the record or the attached affidavit why the original record of trial was missing. This delay is not attributable Appellant. We do, however, find the amount of time to prepare the transcript and exhibits to be reasonable. The trial transcript is 1,260 pages, with 18 prosecution exhibits, 5 defense exhibits, 40 appellate exhibits, and 1 court exhibit. Third, Appellant concedes that he did not assert his right to a timely review, but argues that this should not count against him as he is not an attorney and has neither a college degree nor legal training. However, he has been represented by counsel throughout the trial and the appellate process, so we are unconvinced this point weighs in his favor. Fourth, we find that Appellant suffered no prejudice. As the Government points out, once the case was docketed with the court, Appellant requested five enlargements of time to file his appeal, resulting in Appellant's assignments of error brief being filed 243 days after his case was docketed with the court. Therefore, in reviewing the four *Moreno* factors, we find no violation of Appellant's due process rights.

Recognizing our authority under Article 66(d), UCMJ, we have also considered whether relief for excessive post-trial delay is appropriate even in the absence of a due process violation. After considering the appropriate factors, we conclude it is not.

## III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d).

Accordingly, the findings and the sentence are **AFFIRMED**.



FOR THE COURT

CAROL K. JOYCE
Clerk of the Court